# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 28, 2001

## STATE OF TENNESSEE v. JAMES D. NEWLAND

### Appeal from the Criminal Court for Sullivan County
### No. S40,914     Phyllis H. Miller, Judge

---

### No. E2001-01055-CCA-R3-CD
### May 17, 2002

---

The defendant, James D. Newland, appeals from the Sullivan County Criminal Court's revoking his probation that was ordered for his guilty plea to rape. The defendant contends that the trial court abused its discretion in revoking his probation and sentencing him to confinement. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Nat H. Thomas, Kingsport, Tennessee, for the appellant, James D. Newland.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant pled guilty to rape, a Class B felony, and the trial court sentenced him as a violent offender to eight years. Upon the defendant serving one hundred days in jail, the remainder of his sentence was to be served on supervised probation. The record reflects that the petitioner completed his one-hundred-day jail sentence on October 31, 1999. On March 2, 2001, the defendant's probation supervisor filed a probation violation warrant alleging that he had violated the special conditions of his probation by (1) not leaving a public place where the victim was present, a requirement of his treatment plan with Counseling and Consultation Services; (2) having contact with the victim; and (3) being around children.

At the revocation hearing, Linda Burrow of the Sullivan County Department of Probation and Parole testified that she supervised the defendant's first six months of probation. She said that before the defendant's probation began, she went over the rules of his Probation Supervision Order

with him.  She said that one of the rules of the defendant's probation was that he had to maintain full-time employment.  She said that although the defendant was self-employed, she was able to verify his employment through job receipts he gave to her.  She said that the defendant also worked for Goodwill but that he was fired from Goodwill for improperly picking up donated merchandise.

Ms. Burrow testified that in addition to the rules, the defendant's probation order also had "special conditions."  She said that she went over these special conditions with the defendant and that he never told her that he did not understand them.  The state introduced the probation order into evidence.  The order required the defendant's completing a treatment program devised by Counseling and Consultation Services, not having contact with the victim, and not being around children.  Ms. Burrow said that the defendant was cooperative and came to scheduled meetings.

On cross-examination, Ms. Burrow testified that the defendant completed four hundred fifty hours of community service, completed an Alcoholics Anonymous (AA) program, was home when she conducted curfew checks, and never failed a random drug test.  She said that he abided by the rules of his probation and that she was satisfied with his performance.  She said that she never received a complaint about the defendant being around children.

The sixteen-year-old victim, who was thirteen years old at the time of the rape, testified that at 8:00 p.m. on February 18, 2001, she was at a Kingsport Wal-Mart.  She said that she was alone and looking for crayons in the toy department.  She said that as she walked along the crayon aisle, she saw the defendant and made eye contact with him.  She said that she was about twenty feet away from the defendant and that she was certain he saw her.  She said that she left the toy department immediately and went to the back of the store in order to give the defendant time to leave Wal-Mart.  She said the defendant was supposed to leave the store if he saw her there.

The victim testified that when she got to the back of the store, she telephoned her mother and told her mother that she would be home late.  She said that she waited about ten minutes and returned to the toy department to get the crayons.  She said that when she returned to the crayon aisle, the defendant was still there and that he was watching her.  She said that she went to several aisles in the toy department and that the defendant followed her from aisle to aisle.  She said that he also stared in her direction, made eye contact with her, and got closer to her.  She said that a boy and a girl were with the defendant and that the children looked to be no older than seven years old.  She said that at one point, the defendant tucked back the little boy's jacket collar.  She said that a man, who appeared to be about thirty years old, stayed close to the defendant.

The victim testified that after the defendant had followed her for about five aisles, she went to the front of the store and telephoned a friend.  She said that she asked the friend to pick her up because she was afraid to drive herself home and did not want to leave the store alone.  She said that she did not call a Wal-Mart security guard because she did not want to confront the defendant.  She said that while she was waiting at the front of the store for her friend, the defendant came out of the toy department, looked toward the front of the store, and again made eye contact with her.  She said that the friend picked her up and that she called the police when she got home.  She said that a police

officer came to her house and that she told him about seeing the defendant. She said that after the incident at Wal-Mart, her family started receiving frequent hang-up telephone calls. She said that her family never determined who was making the calls.

On cross-examination, the victim testified that before seeing the defendant on February 18, she had not seen him since June 1999. She said that she had not changed her appearance during that time. She acknowledged that when she telephoned her mother from Wal-Mart, she did not tell her mother that she had seen the defendant. However, she stated that she was scared, was not thinking clearly, and did not want her mother to worry about her. Although the victim had testified on direct examination that she telephoned her friend from the front of the store, she stated on cross-examination that she telephoned her friend while she was in the back of the store. She said that the two children were walking with the defendant and that she did not see a woman with him. She said the defendant had a mad look on his face but made no threats toward her.

Dr. Mike Adler of Counseling and Consultation Services, a clinic that treats sexual offenders, testified that he began working with the defendant in October 2000. He said that after the defendant served one hundred days in jail, the defendant participated in the clinic's sex offenders program. He said that before participating in the program, the defendant signed a form stating that he understood the program's guidelines and agreed to abide by them. He said that the guidelines came from the Tennessee Sex Offenders Special Guidelines, which were part of all sex offenders' probation requirements. He said that the guidelines required the defendant to leave immediately any public place where the victim was present and prohibited the defendant from having contact with the victim. He said the guidelines also prohibited the defendant from having contact with children and that the defendant knew to stay away from places where children were likely to be present, such as toy stores, toy departments within stores, and playgrounds. He said that he reemphasized these guidelines during the defendant's group therapy sessions and that the defendant never indicated that he did not understand them.

Dr. Adler testified that the defendant told him about seeing the victim in Wal-Mart on February 18. He said that the defendant's version of the incident indicated that although the defendant did not leave the store immediately, the defendant had no further contact with the victim. He said that during a group therapy session, several group members confronted the defendant about being in the toy department and the defendant responded that he "really didn't think about that."

On cross-examination, Dr. Adler testified that after the defendant saw the victim, the guidelines required the defendant to leave the property immediately, not just the toy department. He said the "no contact with children" guideline meant that the defendant could not go into a toy department even if he was accompanied by another adult. He said the guideline also meant that the defendant could not talk in the store with a friend, who was accompanied by children. He said the defendant understood how to follow the guidelines.

Robert English, the defendant's probation officer at the time of the alleged violation, testified that he went over the special conditions of the defendant's probation with the defendant and that the

defendant appeared to understand them. He said that he learned of the defendant's probation violation as a result of police investigating the incident. He said that when he questioned the defendant about the incident, the defendant stated that he might have seen the victim in Wal-Mart. He said that when he asked the defendant if the defendant had been around any children, the defendant said that he saw a friend in Wal-Mart and that the friend may have had children with her. On cross-examination, Mr. English said that before the incident, the defendant had done nothing to violate probation. He said the defendant was cooperative and attended scheduled meetings.

Holly Ann Dayo testified that she and the defendant were friends. She said that she had a sixteen-year-old daughter and a three-year-old son but that her children had never had contact with the defendant. She said that on February 17, 2001, the defendant had chest pains and went to the hospital. She said that the next day, she and the defendant watched an auto race together and went to Wal-Mart about 7:45 p.m. to get a model car. She said the defendant was "a little shaky" and got a shopping cart. She said that they went to the toy department and that she looked through the model cars. She said that the defendant stood behind her with the shopping cart and that he was never out of her sight.

Ms. Dayo testified that as they left the toy department, the defendant stopped to talk to a lady. She said that she did not know the lady and that she stood nearby as the defendant and the lady talked. She said that the lady had two children with her and that the children appeared to be about seven and nine years old. She said that when the defendant and the lady finished talking, the defendant walked back to Ms. Dayo and they went to another department in the store. She said that the defendant bought a tackle box and that they left Wal-Mart. She said that she did not see the defendant moving down the aisles in the toy department and that he did not tell her that he had seen the victim. She said the defendant did not act upset or aggravated. On cross-examination, Ms. Dayo testified that she had two convictions for driving under the influence. She said that the defendant did not touch the two children and that the children did not follow the defendant. She said that she did not recall seeing a teenager with red hair in the toy department.

Rhonda Browder, the defendant's former co-worker, testified that she saw the defendant in Wal-Mart on February 18. She said that her fourteen-year-old son and nine-year-old daughter were with her and that she talked to the defendant for a few moments. She said that the defendant was with a woman and that the woman waited nearby as she talked with the defendant. She said that the defendant did not touch her children and that he was polite.

The defendant testified that he was in Wal-Mart with Holly Dayo on the 18th but that no children were with him. He said that he talked with Rhonda Browder for a couple of minutes and that she had her two children with her. Although the defendant stated at first that he had not seen the victim in Wal-Mart, he then said that he did not "know if it was her or not for sure." He said that he later told Dr. Adler that he thought he had seen the victim. He denied following the victim, being around children, or telephoning the victim's house. He said that he did not touch a child in Wal-Mart on the 18th. He said he knew that the special conditions of his probation required him to leave

a store if he saw the victim. However, he stated that because he was not sure he had seen the victim in Wal-Mart, he did not think that he had to leave the store.

On cross-examination, the defendant acknowledged that he had known the victim for years. He said that if the person he saw in Wal-Mart on the 18th was the victim, then he saw her once in the toy department and again at the front of the store. He said that he did not tell Dr. Adler or Mr. English about seeing the victim in the front of the store. He said that he knew he was supposed to stay away from places where children might be present, including toy departments.

The trial court credited the victim's testimony and noted that the defendant told several different stories about whether he saw the victim. The trial court stated that the victim had no duty to move away from the defendant and that the defendant should have left the store when he saw her. The trial court also believed the victim's testimony about the defendant having two children with him and touching one of them. The court held that the defendant violated his probation and ordered that he serve the remainder of his sentence in confinement.

The defendant contends that the trial court abused its discretion in revoking his probation and ordering that he serve the remainder of his sentence in incarceration. He contends that the evidence did not support the trial court's decision and that, in any event, a less harsh punishment would have been appropriate. The state claims that the trial court did not abuse its discretion. We agree with the state.

A trial court may revoke probation upon finding by a preponderance of the evidence that the defendant has violated a condition of probation. Tenn. Code Ann. §§ 40-35-310, -311(e). If the trial court revokes probation, it can "(1) order incarceration; (2) cause execution of the judgment as it was originally entered; or (3) extend the remaining probationary period for a period not to exceed two years." State v. Hunter, 1 S.W.3d 643, 648 (Tenn. 1999). The decision to revoke probation is within the sound discretion of the trial court, and its judgment will be reversed only upon a showing of an abuse of discretion, reflected in the record by an absence of substantial evidence to support the trial court's findings. State v. Gregory, 946 S.W.2d 829, 832 (Tenn. Crim. App. 1997) (citation omitted).

In this case, the trial court credited the victim, who testified that the defendant saw her in Wal-Mart, followed her from aisle to aisle, and got closer to her. She also stated that two children were walking with the defendant and that he touched one of them. This evidence reflects that the defendant violated the special conditions of his probation. Given the nature of the offense and the nature of the violation of the conditions, we do not quarrel with the obvious no-tolerance policy adopted by the trial court. Nothing preponderates against the trial court's findings. The judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, JUDGE